JOHN GULICK and WILLIAM GULICK *against* THOMAS WARD and CHESTER BAILEY, survivors of JOSEPH LYON, dec'd.

A contract which contravenes the policy of an act of Congress and tends to defraud the United States, is void.

If A. agree to give B. 1000 dollars, on condition that B. will forbear to propose or offer himself to the postmaster-general to carry the mail on a mail route, such agreement is against public policy, and no action can be maintained upon it.

*Wood*, for the plaintiffs; and

*W. Chetwood* and *M. Ogden*, for the defendants.

The facts in this case are sufficiently developed in the opinions delivered.

Ewing, C. J.   This action was brought to recover the sum of $1,000, stipulated in a written agreement, to be paid by the defendants to the plaintiffs.   Upon the trial at the Circuit Court, the defendants insisted that the promise was void, because the consideration was illegal, and the plaintiffs were therefore not entitled to recover.   The judge reserved the question for determination here, and a verdict was rendered for the plaintiffs, which the defendants now seek to set aside.   The agreement between the parties, and the consideration of the promise are fully developed in the declaration, which is in these words :

" Whereas, on the 20th day of September, in the year of our Lord eighteen hundred and twenty-three, the post-master general of the United States of America, at the city of Washington, in the district of Columbia, to wit, at New Brunswick, in the county of Middlesex, was minded, and intended to make a contract with good and responsible men, for carrying at a fair and reasonable price, to be agreed upon by the said post-master general, and such men, the mail of the United States from the city of Philadelphia to the city of New York, for such a term or time as might be agreed upon between them ; and whereas, the said William Gulick and John Gulick, did propose, and intend to endeavor to obtain the said contract, to carry the said mail, between the said cities, at such just and reasonable price, and were well provided, with horses, stages, sulkies and drivers, and were recommended and known to the said post-master general, to be thus provided ; and to be of good reputation and credit, and to be relied on for the faithful performance of all and every agreement they should make in the premises, and

were attending on the day and year aforesaid, at the said city of Washington, to offer for and endeavor to procure such contract; and whereas also, the said Isaac Ward, and also one Chester Bailey, (whom the sheriff of the county of Essex has returned, not to be found in his bailiwick) and also one Thomas Lyon, now deceased, and whom the said Isaac and Chester have survived, were also minding and intending to procure for themselves, the said contract, at a just and reasonable price, and were also of good credit and repute, and provided in like manner, to perform any agreement which they might make in the premises, with the said post-master general, and were also personally attending at the said city of Washington, but were apprehensive that as the said John Gulick, had for many years before that time, carried the said mail, over a large part of the said route, and was well known and esteemed by the said post-master general, as a faithful and a punctual man in the performance of his engagements, that the said John Gulick, and the said William Gulick might, on those accounts, be preferred and obtain the said contract. Whereupon, in consideration of the said premises, and also in consideration that the said John Gulick and William Gulick, would forbear to propose or offer themselves to the said post-master general, and also forbear to procure any other persons to propose to him, to carry the said mail on the route aforesaid, or any part thereof, for such time and term as should be included in the contract, then intended to be made. They, the said Isaac Ward, Chester Bailey and Thomas Lyon, in his life time, on the year and day aforesaid, at Washington, to wit, at New Brunswick, in the county of Middlesex, undertook and faithfully promised the said John Gulick and William Gulick, that if they the said Isaac, Chester and Thomas, should become contractors as aforesaid, they would pay unto the said John Gulick and William Gulick, the sum of one thousand dollars, in sixty days after the first day of January, then next ensuing, and the said

John Gulick and William Gulick say, that confiding in the said promise, and undertaking of the said Isaac, Chester and Thomas, they did from the time of making thereof wholly forbear from proposing or offering themselves to the said post-master general, and from causing any of the persons to offer to carry the said mail on the said route, or any part thereof, for the time of the said contract; and they the said Isaac, Chester and Thomas, (being preferred by the said post-master general, to any other candidates for the said contract) did obtain the said contract, for carrying the said mail on the said route, at a just and reasonable price, for the time and term of four years, and have enjoyed the benefits, advantages and compensation, in the said contract, secured to such contractors. By reason of which said premises, the said Isaac, Chester and Thomas, in his life time, and the said Isaac and Chester since his death, became liable to pay unto the said John and William the said sum of one thousand dollars, in sixty days after the first day of January, in the year of our Lord eighteen hundred and twenty-four, according to the form and effect of the said promise and undertaking."

Is this promise valid ? Is the consideration of it legal ?

By the act of the congress of the United States, regulating the post office establishment, 4 *Vol, Ed.* of 1816, 293, *sec.* 8, *it is enacted*, That it shall be the duty of the post-master general to give public notice, in one or more of the newspapers published at the seat of government of the United States ; and in one or more of the newspapers published in the state, or states, or territory, where the contract is to be performed, for at least six weeks before entering into any contract for carrying the mail, that such contract is intended to be made, and the day on which it is to be concluded, describing the places from and to which such mail is to be conveyed, the time at which it is to be made up, and the day and hour at which it is to be delivered. He shall moreover, within ninety days after the making of any contract, lodge a dupli-

cate thereof, together with the proposals, which he shall have received respecting it, in the office of the comptroller of the Treasury of the United States.

Pursuant to the requirement of the act of congress, the post-master general had given public notice of his intention to contract, and his readiness to receive proposals, for carrying the mail between the cities of Philadelphia and New York. The parties in this suit, in consequence of this notice, attended to Washington, intending to offer proposals, when the arrangement stated in the declaration was there made between them, the plaintiffs relinquished their intention, and the contract was made by the post-master general with the defendants.

The policy of the provision contained in the act of congress requiring this procedure by the post-master general, in thus publicly inviting proposals is, to enlarge the number of offers, to increase the competition among persons disposed to contract, and thereby not only to secure to the United States faithful and capable carriers, but to secure the performance of this important public service in the best manner, and upon fair, just and reasonable terms. The principle is the same as requires a sheriff or executor to give public notice of the sale he is about to make, or induces an individual publicly to announce the vendue of his property. Now an arrangement which shall diminish the number of competitors, lessens the number of proposals, or induce any one or more to abandon his intention of making an offer to contract, is most evidently in direct contravention of the policy of the act of congress, and tends to defraud, or perhaps it may be broadly asserted, does at all times actually defraud the United States. It defeats the policy of the statute, for it destroys the competition and precludes the advantages which inevitably result from it. The expense to the government is certainly augmented. Of two individuals who are willing to perform the service for the same remuneration, one may, for various reasons, be far more eligible than the

other. But the most eligible may be induced to withdraw. It operates to defraud the United States. The premium paid to prevent competition is directly or indirectly charged upon them. The terms proposed are always calculated to cover the expenditure. The corollary is indisputable, that if the successful contractor can afford to pay one thousand dollars to induce a rival to stand out of his way, he can, if not compelled to make such payment, afford to perform the service for precisely that sum less than the recompense he is to receive from the post-master general. To the contractor it is exactly the same, whether he reduces the sum he requires from the public one thousand dollars, or whether he pays that sum to his intended competitor. If in the present case, the defendant could afford to pay to the plaintiffs one thousand dollars, it is conclusive evidence that they required of the public that sum more than the service they were to perform was justly worth. The evidence produced on the trial of this cause, and detailed in the state of the case before us, fully proves the truth of these remarks, the importance of the competition, and the effects of it upon the interest of the public service. After the defendants had induced the plaintiffs to abandon their intention of making proposals, and had exhibited their offer, they discovered very unexpectedly another competitor, and that another proposal was made which they had not anticipated nor silenced. They immediately lowered their proposal one thousand five hundred dollars, and this too, to prevail against persons who were not like the plaintiffs, "well provided with horses, stages, sulkies and drivers," and who had, not like them, been accustomed to carry the mail on the route in question, and whose ability and experience the post-master general might therefore justly hold in high estimation. The circumstances disclosed on the trial, then, most manifestly support the conclusion naturally drawn from the agreement itself; that in object and effect it was inconsistent with the policy of the act of congress, and tended, to say the best, to defraud the United States.

The principles of law, which compel a court to refuse to enforce a promise founded on such consideration, are very clear, very salutary, and perfectly well established. In *Jones* v. *Randall, Cowp.* 39, Lord Mansfield and the Court of King's Bench, held that "many contracts which are not against morality, are still void as being against the maxims of sound policy." In *Blachford* v. *Preston,* 8 *T. R.* 95, *Lawrence,* J. said, " a plaintiff cannot recover in a court of justice, whose cause of action arises out of a contract made between him and the defendant in fraud, or to the prejudice of third persons." And on that ground, as well as because it was contrary to the principles of public policy to allow of such contracts as that before the court, he held that the plaintiff could not maintain his action. In *Mitchell* v. *Smith,* 1 *Binney,* 120, the Supreme Court of Pennsylvania held that contracts to violate the rules of decency or morality, or oppose principles of sound policy of the country are illegal and void. In *Sterling* v. *Sinnickson,* 2 *South.* 756, *Chief Justice Kirkpatrick* said, "if the consideration be against the public policy, it is insufficient to support the contract;" and *Justice Rossell* said, " it is a general principle that all obligations for any matter, operating against the public policy and interests of the nation, are void." In 3 *Halsted* 54, a note made by a candidate for the office of sheriff, in consideration of a promise to give him the interest of the payee at the election, was held illegal and irrecoverable. In *Parsons* v. *Thompson,* 6 *Hen. Bl.* 322, the plaintiff had long been master-joiner of the dock yard at Chatham, and was entitled to be superannuated and to retire on a pension ; the defendant wishing the office promised if he would retire, in case he should obtain the office, as he afterwards did, to allow a certain portion of the proceeds, to recover which, the action was brought. The court had held that the agreement made without the knowledge or sanction of the admirality, who held the power of appointment, had no sufficient consideration to maintain an action. In *Han-*

*nay* v. *Eve*, 3 *Cranch* 247, the Supreme Court of the United States held, that an agreement made between foreign mariners to save a ship and cargo, under the semblance of a condemnation in the Admiralty Court here, was not an immoral act, but a stratagem authorized by the laws of war; yet as it was a fraud on a resolution of congress, that is to say, a contrivance to evade the resolution, the courts of the United States could furnish no aid in giving efficacy to it. In *Jones* v. *Caswell*, 3 *John. Cases* 29. In consideration of forbearance or omission to bid, at a sheriff's sale of real estate, a promissory note on which this action was brought, was given by the defendant, who became a purchaser. The consideration was held to be illegal and the note irrecoverable. *Justice Radcliff* said, " it was a consideration which ought not to be sanctioned in a Court of Justice. The law has regulated sales on execution with a jealous care, and enjoined such proceedings as are likely to promote a fair competition. A combination to prevent such competition is contrary to morality and sound policy." *Justice Kent* said, " It was a consideration against public policy, which encourages bidding at sales on execution. I think the consideration must be adjudged void as against public policy, and the interests of the original debtor whose property was liable to be sacrificed by such combinations." In *Doolin* v. *Ward*, 6 *John.* 194, certain articles were to be sold by auction, at the navy yard, at Brooklyn, and the parties being desirous to purchase, agreed that the plaintiff should not bid against the defendant, who should purchase the articles and afterwards divide equally, it was held that the contract was without consideration, and void, and against public policy. In *Wilbur* v. *How*, 8 *John.* 444, a contract or job for making a road, being set up at auction, the parties agreed that if either bid it off, it should be divided between them. One bid it off and refused to give the other a share. The court held that the contract was a *nudum pactum* and a fraud on the vendor. In *Thompson* v. *Davies*, 13 *John.*

112, the court decided that an agreement, which tended to prevent competition at a sale under execution, was contrary to public policy and void. *Spencer,* J. in delivering the opinion of the court, said, "It had been urged that the plaintiff was not bound to bid on the second execution, and was therefore at liberty to enter into this agreement. That is not the test of the principle. In none of the cases cited was the party bound to bid, but being at liberty to bid, he suffered himself to be bought off in a way which might prevent a fair competition. The abstaining from bidding upon consent and by agreement, under the promise of a benefit, for thus abstaining, is the very evil the law intends to repress. A public auction is open to every one, but there must be no combination among persons competent to bid, silencing such bidders, for the tendency to sacrifice the debtor's property is inevitable."

It was insisted by the plaintiff's counsel, on the argument, that some of these cases have no application here, because the proceeding on the part of the post-master general is not an auction. It is of very little importance by what name it is most aptly to be designated, if the principles illustrated by these cases may be justly brought to bear upon it. Yet, is there any radical difference? Is a proposal in writing less a bid than a verbal offer? Is the Dutch mode of sale not an auction, because the biddings are downward? Does it lose the name of auction when it happens that no more than one bid has been made by any one bidder when the article is struck off? May not a sheriff or executor, like the post-master general, if no just and competent offer be made, decline, by striking off the property, to accept either and adjourn the sale to a more favorable season, and for new and better offers? Is not the competition equally desirable in the one as in the other case? Is not the combination, which may silence a bidder alike prejudicial? If a party be bought off, does it not in both cases prevent a fair competition? Is not the abstaining from bidding under the

promise of a benefit as much in the one as in the other case, an evil which the law does and ought to repress? It may not be unworthy of notice, though it may not deserve to aid the argument, that the post-master general in his advertisements, one of which I have recently seen, speaks of the persons offering proposals as bidders.

It was farther insisted, that the object of the section of act of congress was simply to point out the mode whereby publicity should be given, and a competition be brought about and nothing more. But it is clear that this view of the matter falls below the wisdom of the act. Why induce a competition unless to subserve some valuable purpose? And can it be possible that this purpose shall be defeated with impunity? Can it be possible that even the courts of the United States are obliged to give their aid, and yield their power to enforce a contract avowedly designed to counteract this purpose, and to deprive the government of the most valuable benefits this competition was designed to attain?

The cases cited and relied on by the counsel of the plaintiffs, do not in the slightest measure conflict with those which I have referred to, nor establish any principle which can support the contract made between these parties. In *Hutton* v. *Lewis*, 5 *T. R.* 639, the plaintiff, the master of an academy, agreed to relinquish his situation in favor of the defendant, to grant him a lease of the house, and to assign him part of the household furniture and fixtures at a valuation, in consideration of which the defendant agreed to pay the plaintiff an annuity. This annuity was sustained. But the public was not injured by the change of schoolmasters, unless indeed the one was preferable to the other which the case does not evince or assert. The case of *Davis* v. *Mason* 5 *T. R.* 48, shews that a bond restraining a person from exercising a trade or profession in a particular place, may on proper consideration, be valid, while an obligation not to exercise it at any time or place would be illegal.

Now the ground on which this decision rests, is that such an agreement is not in its tendency injurious to the public. It is of little importance that the tradesman is excluded from one spot while every other place is open to him. This position is expressly assumed by the Supreme Court of Massachusetts, in another of the cases cited for the plaintiff. *Pierce* v. *Fuller*, 8 *Mass.* 223. The defendant who had been running a stage from Boston to Providence, entered into an obligation not to run there in opposition to the stage the plaintiff had, or contemplated to, set up. The court held the agreement valid. They said "bonds to restrain trade in general, are unquestionably bad as tending to create a monopoly injurious to the public. But bonds to restrain trade in a particular place, may be good if executed for a sufficient and reasonable consideration. The public appear to have no interest in this question. If the plaintiff did not run his stage, the defendant might run a stage, for it could not be in opposition to the plaintiff's stage, and it is indifferent to the public which of these run a stage." So in the case of *Perkins* v. *Lyman*, 9 *Mass.* 522, where the agreement that the defendant would not be interested in any voyage to the north west coast of America for seven years, was held good. The court said, the principle relied on to shew the invalidity of the agreement, as against the policy of the law being in restraint of trade, did not apply. This is a trade but lately discovered, and can be beneficial to but a small number of adventurers. One adventurer, may engage to retire from it for a valuable consideration. Instead of an injury to the public, the community may receive a benefit from such a procedure, as it will go to prevent the trade from being overdone, and so becoming profitable to none. The case of *Parker* v. *Brown.* *Cro. Jac.* 612, seemed to be mainly relied on by the plaintiff's counsel. The parties being both applicants to the sheriff of Middlesex for the office of under sheriff, the defendant, in consideration that the plaintiff would desist, promised, if he

obtained the office, to pay him a sum of money. The court held the consideration to be lawful and the promise valid. Whether such a consideration would at the present day be deemed sufficient and legal might perhaps admit of question. But taking the case to be correctly decided, there is nothing in it which bears analogy to the matter now in discussion. Neither the sheriff nor the public were or could be prejudiced by the withdrawal of one of the applicants. No competition was to be fostered. Public policy did not require the anxious rivalry of candidates perhaps, indeed, was best promoted by leaving the sheriff to unbiassed and unsolicited selection. There was no interest either public or private which could suffer from the absence of competition.

It was further said, that the policy to defeat which is forbidden, must be in general in its nature; as a contract to trade no where, or not to marry at all, is bad, while a contract not to trade in a particular place, or not to marry a particular person, will be sustained. But most of the cases referred to furnish an answer to this argument. While they shew that some specified cases are not against public policy, and therefore are not illegal, they prove that a contract which does contravene it will not be enforced. These cases therefore, directly apply to the contract before us, if it has been made to appear that it is against public policy; otherwise it is admitted, they do not apply. The real question is not whether the contract be general or special, but whether its object is reproachable. The agreements respecting actions which have been condemned were not to abstain from bidding at all auctions, but in a specific instance. Moreover, a contract whose tendency is directly to prejudice a third person, whether general or particular, can meet with no countenance.

The plaintiff's counsel further contends, that the arrangement made between these parties cannot be wrong, because they might have united, made joint proposals; and thereby

avoid collision as the defendants had done, and had become joint contractors. But the cases are widely different. The union of persons openly making a joint proposal, is fairly communicated and avowed to the post-master general. Such an union' may serve to ensure a faithful, regular and able transportion of the mail. The post-master general holds the responsibility of all who are to derive emolument. No one reaps the reward without sharing the risk. A joint offer openly made enables him to decline it, if thereby the public interest may be best promised. He may improve its advantages and guard against its inconveniencies.

I am of opinion the consideration of the promise made by the defendants was unlawful; the plaintiffs are not entitled to recover; and the verdict ought to be set aside, and without the payment of costs.

FORD, J. In pursuance of an advertisement by the post-master general of the United States, that he would receive proposals for a contract to carry the mail between Philadelphia and New York, these parties both repaired to Washington, where the defendants finding no rival applicants in attendance but the plaintiffs, came to a private agreement to pay them a thousand dollars, if they would not themselves propose to carry the mail, nor procure others to do so, on any part of that route, for the next ensuing contract : it was for non-payment of the money so promised, that the plaintiffs brought the present action. The jury found a verdict for the plaintiffs, but it was understood to be subject to the opinion of the court at bar, on several points that were offered for a nonsuit at the trial of the cause. Accordingly the defendants moved for a new trial upon those grounds; and upon an allegation, that the verdict is contrary to and against the weight of evidence.

The *first* ground for a nonsuit was one that grew out of an objection to the declaration, for stating the consideration of the promise differently from the statement of it in the article

Gulick *v.* Bailey.

of agreement. The article, after stating the foregoing promise, contained a further agreement, that the defendants should take of William Gulick, *one* of the plaintiffs two mail coach teams and *his* proportion of the mail coaches, then running on the line, at an appraisement to be made by three men, to be mutually agreed on between the parties; the taking of which teams and coaches was argued by the defendants, to be a part of the consideration on which they agreed to pay the thousand dollars, and yet no mention of those teams and coaches is stated in the agreement as set out in the declaration. I think, however, that the objection is founded on an erroneous conception of the agreement. In consideration that the plaintiffs would not propose for the carriage of the mail, the defendants took upon themselves two things, to pay the plaintiffs a thousand dollars, *and* to take, of one of the plaintiffs, his teams and coaches at a valuation. The whole consideration was, that the plaintiffs should not propose; and this is set out in the declaration; but it was not necessary to set out more promises than those, for the breach of which the plaintiffs demanded recompence; as where, for a *certain consideration*, the declaration laid the promises to have been, that the defendant would deliver him a horse worth £80, which should be a young horse; and the agreement produced was, that he should be a horse worth £80, and a young horse, and be warranted to be *sound*, and never to have been in harness, yet the declaration was holden to be good. 1 *Chit.* 299 ; 8 *East* 7, *Miles* v. *Sheward.*

The *second* ground alleged is, that this contract was contrary to public policy, contrary to the provisions of the act of Congress, and therefore a *nudum pactum* that would not support an action. It cannot be doubted that the contract was *nudum pactum*, if the consideration was illegal and against public policy, for an illegal consideration is as none. Was it then illegal as being against policy? It is. certain that the post-master general is not allowed to contract for

the carriage of the mail in a private way; the act of Congress makes it his duty to offer the contract to public competition, by advertising for sealed proposals; the reasons for which requirement, though not stated in the act, are exceedingly obvious. It tends to destroy favoritism in the bestowal of these great money contracts, by obliging the officer to accept the lowest proposals, or to stand responsible, upon the most weighty reasons, to the government and the public for rejecting them; it affords an equal opportunity to every citizen who thinks he can transport the mail on terms beneficial to the public, to offer his services; it is the best source of information for the officer and enables him to procure the services at the lowest expense of public money. A law thus equal towards the citizens, forming a check on favoritism and corruption in office, and tending to economy in the disbursements of a great department in the government, was worthy of the wisdom of congress; and a court of law can countenance no contract which tends to circumvent or subvert its policy. It did seem to me on first thoughts without time for much reflection during the trial or for any examination of books, that a restraint on the freedom of men to propose or not, for such a contract, was inconsistent with the freedom of the citizen, who must be at liberty to do therein as he pleases. On further consideration, I am still in favor of that freedom; the great objection to the contract is, that it would restrain the plaintiffs from doing as they might wish; and forcing them not to propose, while everybody else was free to do so. The contract imposes on them a restraint from which nothing can set them free, if it be not a legal nullity. The act of congress is built on the freedom of men to propose or not, and a contract in direct restraint of that freedom, necessarily counteracts its policy. We find that the plaintiffs went to Washington, intending to propose for the carriage of the mail on this route, and would have done so agreeably to the policy of the act, if this contract had not interfered with that policy. And I am

prepared to think that it went to the utmost extent, in counteracting the policy of the act and the interest of the department. If there had been twenty applications for this contract, a combination between two, binding only one of them not to propose, would have left nineteen in the field of competition; whereas, here were only two applicants, and this restraint on one of them destroyed the whole of that competition which it was the policy of the law to excite and encourage. If the secret had been kept a few hours longer, the defendants would have obtained an entire monopoly, and the department would have paid $1500 more than the service was worth, one thousand of which would have been sunk in this illegal contract. A clearer case of the repugnance of a contract to public policy, can hardly be imagined, when it undergoes a deliberate examination. Now, it is an immutable principle, that a contract contrary to public policy is void. *Comy. on Contr.* 26. Thus if a statute prohibit the smuggling of goods, and a contract be made between two persons for carrying it on, one of whom afterwards refuses, or goes on and takes all the profits to himself, he may keep them all, for the law will never enforce the contract against him; *Ibid* 38. So if two or more persons combine not to bid against each other at an auction, it is a contract tending injuriously to affect the value of sales at auction, and therefore is void as against public policy. Thus in the case of *Doolin* v. *Ward*, 6 *Johns.* 195, the parties being both anxious to purchase certain goods at auction, agreed not to bid against each other, but that Doolin should bid and divide the profits equally with Ward; he bid off the goods, and the clear profits amounting to $108. Ward sought to enforce this contract at law, but the court refused upon the ground of its tending injuriously to affect the value of sales at auction, and being against public policy it was a void contract. The case of *Wilbur* v. *Howe*, 8 *Johns.* 444, is to the same effect. It was argued that there is no similarity between a bidding at auction, and a proposal or bidding for

the carriage of the mail, because the post-master general is not bound to give the contract to the lowest proposal, but might reject them all together if he deemed them all to be too high. It is still an auction, with limitations or conditions, which are neither unlawful or unusual, if made public before the sale; thus the owner of goods may give notice that they will not be considered as set up under a certain sum; or he may reserve a right of bidding once on them himself. 1 *Com. on Con.* 257. *Cowp.* 395, *Bexwell* v. *Christie.* These conditions do not at all destroy the auction which remains a bidding or proposing subject to these conditions, by way of competition as much as if the modifications did not exist. It was also argued from a case in *Cro. Ja.* 612, *Parker* v. *Brown*, that as withdrawing from competition for the office of under sheriff was holden to be a lawful consideration for a contract; so withdrawing from competition for a contract to carry the mail cannot be considered as unlawful; whereas, it is the policy of the law to encourage competition in one case, while it is indifferent to it in the other. It is no fraud, either on the sheriff or the public, to restrain a person from being an applicant for the office of under sheriff, because public policy is not interested in competition in that case, as it is this and in sales by auction. For these reasons I am of opinion that no action will lie on this contract, and that there ought to have been a nonsuit. This renders it unnecessary to enquire in the second place, whether the plaintiffs did not, by the nature of their measures and advice, virtually and substantially procure other persons to propose for the conveyance of the mail on this route, who but for such measures and advice would not have done it. My impressions from the evidence, at the time of the trial, and even now, would lead me to submit this point again to the consideration of a jury. Let there be a new trial.

DRAKE, J. The consideration of the contract declared on in this case is objected to as insufficient, and against public

policy. And, in the first place, I am strongly inclined to consider it insufficient. The post-master general, agreeably to the act of congress, had advertised for offers to carry the United States mail, and was ready to accept the lowest offers made by a certain time. The parties were attending at Washington, with the view to bid, when they entered into this contract, the consideration of which is, that the plaintiffs should forbear to offer themselves, or procure others to offer, to the post-master general, to carry the United States mail on the route between New York and Philadelphia. Now, what is it that was yielded by the plaintiffs? no property, nor services, no vested interest of any kind. A right of bidding to be sure; but had that right any inherent value? Nobody can say that it had. It must not be supposed to have been worth one thousand dollars. That was not agreed to be given for the right of bidding. Had that been exercised, it is probable it would have proved to be worth nothing. Had both these parties bid, that one thousand dollars, and probably more, would have remained, not with the plaintiffs, but in the public treasury. Nothing was parted with but a bare possibility of making a speculation. The parties found themselves so circumstanced, that by an agreement, they were enabled to take from the pocket of a third party, and put into that of the defendants, a large sum of money, to which neither of them had previously any title. It cannot well be said that the plaintiffs were prejudiced, by losing what they never had; and although the defendants may have been benefited, yet it was not by the property or services of the plaintiffs. This case differs from those in 4 *East* 190, 5 *Term Reports* 118, and others to be found in the books, where a person by assiduity, skill and integrity, in the exercise of a trade or profession, has procured a valuable business, and which he may reasonably expect to retain by the same means. Here is a power of acquiring property fairly obtained, the fruits of which ripen into maturity and enjoyment in the ordinary course

Gulick *v.* Bailey.

of events, to relinquish which is a prejudice to the party abandoning, and an almost certain benefit to him who is expected to succeed to the business. And as respects the public, they may possibly be injured, and possibly benefited. At any rate the injury to the public is too trifling and too uncertain to require any interference with bargains of this' kind; and there being a positive prejudice to one party, and benefit to the other, the consideration is considered sufficient.

But whatever I might conclude, as to the sufficiency of this consideration, if the contract were entirely harmless, I am decidedly of opinion, that it is illegal, being contrary to public policy. " A contract to do that which is injurious to the community, is void by the common law." 2 *Wilson* 350. Now this contract is to pay the sum of $1000 to the plaintiffs, upon condition that they will abstain from doing an act, which shall enable the defendants to make that sum, or more, out of the community; that is, to prejudice the public to that amount, or more. The gain to the defendants, by this contract, added to the $1000, is the precise measure of the injury to the public. An injury directly contemplated by the contract, 'and forming the consideration for it, if it have any. It is not necessary, in this case, to argue, that danger to the public interests is to be *apprehended* from this species of contract; the contract itself contemplates that injury, and ascertains the amount when it fixes the value of the contract; or rather, it points out the sum below which, in the opinion of all the parties, the loss to the public cannot fall.

Let the rule to shew cause be made absolute.